873 P.2d 733 (1994)
In the Matter of the Title, Ballot Title, and Submission Clause Approved February 2, 1994, Respecting the PROPOSED INITIATED CONSTITUTIONAL AMENDMENT CONCERNING LIMITED GAMING IN the CITY OF ANTONITO (Limited Gaming IV), as Determined on Motion for Rehearing.
Angela Wheeler, Robert Fabec, Ray A. Covi, Jr., George S. Shady and Michael T. Giarratano, Petitioners,
and Freda Poundstone, Respondent,
and Natalie Meyer, Rebecca Lennahan and Steve Erkenbrack, Title Setting Board.
No. 94SA49.
Supreme Court of Colorado, En Banc.
May 2, 1994.
As Modified on Denial of Rehearing May 16, 1994.
*736 James E. Klodzinski, Trinidad, Craig A. Murdock, San Francisco, CA, for petitioners.
Joseph Stern, Denver, for respondent.
Gale A. Norton, Atty. Gen., Steven K. ErkenBrack, Chief Deputy Atty. Gen., Timothy K. Tymkovich, Sol. Gen., Maurice G. Knaizer, Deputy Atty. Gen., General Legal Services Section, Denver, for Title Setting Bd.
Justice MULLARKEY delivered the Opinion of the Court.
Petitioners Angela Wheeler, Robert Fabec, Ray A. Covi, Jr., George S. Shady and Michael T. Giarratano, registered electors of the State of Colorado, brought this original proceeding pursuant to section 1-40-107(2), 1B C.R.S. (1993 Supp.), to challenge the action taken by the Initiative Title Setting Board (Board) in setting a title, submission clause,[1] and summary for a proposed constitutional amendment (the Initiative). Denominated *737 "Limited Gaming IV," the Initiative would add a new Section 11 to Article XVIII of the Colorado Constitution. The Initiative would permit limited gaming in Antonito, Colorado, subject to a future local vote; would require that the location and size of gaming premises in Antonito be determined under the Antonito city ordinances in effect on November 25, 1993; and would provide for distribution of revenue from limited gaming in Antonito by the General Assembly. Regardless of the outcome of the local election in Antonito, the Initiative also would make several changes in the procedures presently governing limited gaming. Specifically, the games of craps and roulette, and any other games permitted by the gaming commission, would be added to those presently authorized; the maximum allowable tax rate on limited gaming would be changed from 40% of adjusted gross proceeds to 20% of adjusted net proceeds; and commercial property would be appraised based only on its actual use in areas where limited gaming is lawful.
The petitioners contend that the Board lacked jurisdiction to set a title, submission clause, and summary because the Initiative's proponents failed to comply with section 1-40-104, 1B C.R.S. (1993 Supp.). They further argue that the title, submission clause, and summary are unfair and do not fairly express the true meaning and intent of the proposed constitutional amendment. In her answer brief, Respondent Freda Poundstone also asks this court to declare the signatures collected for the Initiative during the pendency of this appeal to be validly collected, and requests that we award her all reasonable and necessary attorney fees and costs pursuant to section 13-17-102, 6A C.R.S. (1987).[2] For the reasons set forth below, we affirm the ruling of the Board in part, reverse in part, and remand the matter to the Board with instructions.

I
On December 14, 1993, the Initiative's proponents submitted a draft of the Initiative to the legislative council and the office of legislative legal services (legislative offices) for review and comment. After comments were received and a public meeting was held, the proponents modified the Initiative. A final draft of the Initiative was then submitted to the secretary of state.[3]
The Board convened on January 19, 1994, to set the title, submission clause, and summary for the Initiative. After the Board's initial hearing, the petitioners filed separate motions for rehearing contesting the validity of the title, submission clause, and summary fixed by the Board. At the rehearing held on February 2, 1994, the Board made a minor change in the Initiative's fiscal impact statement, but otherwise denied the petitioners' motions. The title, submission clause, and summary as set by the Board on February 2nd read as follows:

Title
AN AMENDMENT TO THE COLORADO CONSTITUTION TO PERMIT LIMITED GAMING, SUBJECT TO A FUTURE LOCAL VOTE, IN THE CITY OF ANTONITO; REGARDLESS OF THE OUTCOME OF THAT VOTE, TO EXPAND THE GAMES WHICH MAY BE CONDUCTED WHEREVER LIMITED GAMING IS LAWFUL, TO REDUCE THE MAXIMUM ALLOWABLE TAX RATE FOR LIMITED GAMING TO TWENTY PERCENT OF ADJUSTED NET PROCEEDS, AND TO REQUIRE THAT COMMERCIAL PROPERTY IN AREAS WHERE LIMITED GAMING IS LAWFUL BE APPRAISED BY THE COUNTY ASSESSOR ON THE BASIS OF ITS ACTUAL USE; AND TO ALLOCATE TAX AND FEE REVENUES FROM LIMITED GAMING IN ANTONITO.

*738 Submission Clause

SHALL THERE BE AN AMENDMENT TO THE COLORADO CONSTITUTION TO PERMIT LIMITED GAMING, SUBJECT TO A FUTURE LOCAL VOTE, IN THE CITY OF ANTONITO; REGARDLESS OF THE OUTCOME OF THAT VOTE, TO EXPAND THE GAMES WHICH MAY BE CONDUCTED WHEREVER LIMITED GAMING IS LAWFUL, TO REDUCE THE MAXIMUM ALLOWABLE TAX RATE FOR LIMITED GAMING TO TWENTY PERCENT OF ADJUSTED NET PROCEEDS, AND TO REQUIRE THAT COMMERCIAL PROPERTY IN AREAS WHERE LIMITED GAMING IS LAWFUL BE APPRAISED BY THE COUNTY ASSESSOR ON THE BASIS OF ITS ACTUAL USE; AND TO ALLOCATE TAX AND FEE REVENUES FROM LIMITED GAMING IN ANTONITO?

Summary
This measure authorizes limited gaming in the city of Antonito, subject to a future local vote held in accordance with section 9(6) of article XVIII of the Colorado [C]onstitution. All gaming under this measure is subject to regulation by the Colorado limited gaming control commission and is confined to areas of the city determined under city ordinances that were in effect on November 25, 1993. Revenues from limited gaming in Antonito are allocated as follows: 50% for senior-citizen health, 20% for education, 15% to Antonito, 10% to Conejos County, and 5% to counties adjacent to Conejos County.
In addition, and regardless of the outcome of the local vote in Antonito, the following changes would take effect wherever limited gaming is lawful within the state:
The definition of "limited gaming" would include craps and roulette and any other games authorized by the gaming commission as well as poker, blackjack, and slot machines, which are now authorized;
The maximum allowable tax on limited gaming activity would be changed from 40% of adjusted gross proceeds to 20% of adjusted net proceeds; and
Commercial property within a city would be appraised, for property tax assessment purposes, only according to its actual use.
The measure is expected to have significant fiscal impact, although the amount is indeterminate. The effect on state revenues from limited gaming would depend on the meaning of "adjusted net proceeds" and the tax rate actually set. In any event, adjusted net proceeds would be a smaller tax base than is currently in place and would likely produce a state tax revenue loss.
Subsequently, the petitioners jointly filed this original proceeding for review of the Board's action. See § 1-40-107(2), 1B C.R.S. (1993 Supp.).

II
The petitioners contend that the Board lacked jurisdiction to fix the title, submission clause, and summary because the proponents failed to comply with section 1-40-104, 1B C.R.S. (1993 Supp.).[4] This section provides:
At the time of any filing of a draft as provided in this article, the proponents shall designate the names and mailing addresses of two persons who shall represent the proponents in all matters affecting the petition and to whom all notices or information concerning the petition shall be mailed. *739 § 1-40-104, 1B C.R.S. (1993 Supp.). According to the petitioners, since the draft of the Initiative filed with the legislative offices listed only one proponent, with no address, the Board lacked authority to set a title, submission clause, and summary. We disagree.
In In re Initiative Concerning "Taxation III", 832 P.2d 937 (Colo.1992), the petitioner similarly argued that the Board did not have jurisdiction to fix a title, submission clause, and summary, because the draft of the initiative filed with the Board listed five proponents, while section 1-40-101(2), 1B C.R.S. (1991 Supp.), required that "[a]t the time of any filing, the proponents shall designate two persons to whom all notices or information concerning the petition shall be mailed." In that case, we rejected the petitioner's argument and held that "[f]ailure to comply with this designation requirement does not affect the jurisdiction of the Board, ... but rather is a procedural requirement which promotes efficient notification." Taxation III, 832 P.2d at 942.
As in Taxation III, we view the designation requirement contained in section 1-40-104 simply as a procedural requirement promoting efficient notification. Thus, we hold that the proponents' failure to designate two persons to receive mail notices did not deprive the Board of jurisdiction in this matter.[5]

III
We next address the petitioners' contention that the title, submission clause, and summary fixed by the Board are unfair and do not fairly express the true meaning and intent of the Initiative.
Article V, Section 1(2) of the Colorado Constitution reserves to the registered electors of this state the constitutional right to initiate legislation and constitutional amendments. Section 1-40-106(1), 1B C.R.S. (1993 Supp.), directs the Board to designate and fix a title, submission clause, and summary for initiative petitions before they are signed by electors. "The purpose of the title setting process is to ensure that both persons reviewing an Initiative petition and the voters are fairly and succinctly advised of the import of the proposed law." In re Initiative on Education Tax Refund, 823 P.2d 1353, 1355 (Colo.1991); Dye v. Baker, 143 Colo. 458, 460, 354 P.2d 498, 500 (1960).
In performing its statutory duty, the Board need not describe every feature of a proposed measure. In re Initiated Constitutional Amendment Concerning Limited Gaming in Burlington, 830 P.2d 1023, 1026 (Colo.1992); In re Proposed Initiated Constitutional Amendment Concerning Limited Gaming in Manitou Springs, 826 P.2d 1241, 1244 (Colo.1992). However, the Board must consider "the public confusion that might be caused by misleading titles," and must "avoid titles for which the general understanding of the effect of a `yes' or `no' vote will be unclear." § 1-40-106(3)(b), 1B C.R.S. (1993 Supp.). The title must correctly and fairly express the true intent and meaning of the proposed measure, and the submission clause set by the Board should briefly, but unambiguously, state the principle of the provision sought to be added, amended or repealed. Id. Further, if the Board determines that the proposed measure will have a fiscal impact on the state or any of its political subdivisions, the summary also must contain an estimate and an explanation of the fiscal impact. Id.
When we review the Board's title setting process, we do not address the merits of a proposed initiative, interpret the meaning of the language or suggest how it will be applied if adopted by the electorate. In re Proposed Initiated Constitutional Amendment Concerning the "Fair Treatment of Injured Workers Amendment", 873 P.2d 718, 719-720 (Colo.1994); In re Proposed Election Reform Amendment, 852 P.2d 28, 31-32 (Colo.1993). Nor will we interfere with the Board's choice of language if it clearly and concisely reflects the central features of the initiative. In re Proposed Initiated Constitutional *740 Amendment Concerning Limited Gaming in the Town of Idaho Springs, 830 P.2d 963, 970 (Colo.1992); In re Limited Gaming in Manitou Springs, 826 P.2d at 1245. However, we will reject the Board's language when it is inaccurate or misleading with respect to the meaning and intent of the initiative. Id. "Petition signers and voters should not be misled into supporting or proposing a proposition by reason of the words employed." In re Proposed Tobacco Tax Amendment 1994, 872 P.2d 689, 694 (Colo. 1994).
With these principles in mind, we now turn to the challenges to the title, submission clause, and summary raised by the petitioners.

A
The petitioners first assert that the title, submission clause and summary are misleading because they fail to disclose that the Initiative would amend Article X, Section 3 of the Colorado Constitution relating to property taxation. Section 3(1)(a) provides that property throughout the state must be appraised based on its actual value, whereas the Initiative would require commercial property to be appraised on the basis of its actual use in areas where limited gaming is lawful. Even if we assume that the petitioners are correct concerning the legal ramifications of the Initiative, the Board is not required to state the effect that an initiative may have on other constitutional provisions. In re Election Reform Amendment, 852 P.2d at 33; In re Limited Gaming in Burlington Amendment, 830 P.2d at 1027-28. Moreover, any potential effect that the proposed amendment may have upon Article X, Section 3 is a question of constitutional interpretation and is not subject to review in this proceeding. In re Fair Treatment of Injured Workers Amendment, at 720; In re Proposed Initiative on Surface Mining, 797 P.2d 1275, 1279 (Colo.1990); In re Casino Gaming Initiative, 649 P.2d 303, 310 (Colo.1982). Accordingly, we reject the petitioners' initial challenge to the title, submission clause, and summary as fixed by the Board.

B
The petitioners next contend that the Initiative changes the definition of "limited gaming" and imposes a new legal standard for gambling. Relying on In re Proposed Initiative on Parental Notification of Abortion for Minors, 794 P.2d 238 (Colo.1990), they conclude that the title should contain a definition of "limited gaming." We disagree.
In essence, the petitioners are arguing that neither the title nor submission clause reflects that the Initiative will amend Section 9(4)(b) of Article XVIII of the Colorado Constitution by adding craps, roulette, and any other games authorized by the gaming commission, to those presently permitted. Currently, Section 9(4)(b) defines limited gaming as "the use of slot machines and the card games of blackjack and poker, each game having a maximum single bet of five dollars." Colo. Const. art. XVIII, § 9(4)(b).
Contrary to the petitioners' argument, the title and submission clause clearly signal a proposed change in the scope of limited gaming that will apply to all areas where limited gaming is permitted. Both the title and submission clause contain the phrase "TO EXPAND THE GAMES WHICH MAY BE CONDUCTED WHEREVER LIMITED GAMING IS LAWFUL." As we previously stated, the Board is not required to explain the effect that the Initiative will have on other constitutional provisions. See In re Limited Gaming in Burlington Amendment, 830 P.2d at 1027-28.
The petitioners also argue that the Initiative creates a new definition of legal gaming because it does not set a betting limit and, since the Initiative would add an entirely new section to Article XVIII, the five dollar betting limit contained in Article XVIII, Section 9(4)(b) would not apply. This argument is not persuasive. The language of the Initiative is silent with respect to a maximum betting limit, but at the public hearing held on December 28, 1993, one of the proponents of the Initiative testified that "[w]e're not intending to raise the five-dollar betting limit or give the [gaming commission] the authority to do so." We can only consider whether the title, submission clause, and *741 summary reflect the intent of the Initiative, not whether they reflect all possible problems that may arise in the future in applying the proposed language. In re Casino Gaming Initiative, 649 P.2d at 310. Although the Initiative may raise questions in the future concerning the maximum betting limit, the silence of the title and submission clause in this regard is consistent with the proponents' stated intent not to change the present limit.

C
In addition, the petitioners argue that the use of the words "adjusted net proceeds" is a "catch phrase," prohibited in ballot titles under Say v. Baker, 137 Colo. 155, 322 P.2d 317 (1958). According to the petitioners, the use of the phrases "adjusted net proceeds" and "adjusted gross proceeds" in the title, submission clause, and summary are likely to cause confusion with the term "adjusted gross income," especially since the Initiative does not define what the term "adjusted net proceeds" means. Again, we disagree. A "catch phrase" consists of "words which could form the basis of a slogan for use by those who expect to carry out a campaign for or against an initiated constitutional amendment." In re Casino Gaming Initiative, 649 P.2d at 308; Say, 137 Colo. at 160, 322 P.2d at 320. The words "adjusted net proceeds" and "adjusted gross proceeds" clearly are not slogans forbidden under Say.
It is true that the phrase "adjusted net proceeds" is not defined in the title, submission clause, or summary. However, this ambiguity does not render the Initiative infirm. At hearings before the Board, the proponents of the Initiative testified that they intended for the phrase "adjusted net proceeds" to remain undefined so that the courts and the legislature would interpret its meaning. See In re Proposed Initiated Constitutional Amendment Concerning Unsafe Workplace Environment, 830 P.2d 1031, 1034 (Colo.1992). Thus, the fact that the phrase is not defined reflects the true intent and meaning of the Initiative.

D
The petitioners advance several other criticisms of the language selected by the Board for the title, submission clause, and summary. First, the petitioners assert that the phrase "areas where limited gaming is lawful" is misleading because it implies that gambling is widespread throughout the state. In the petitioners' view, the title, submission clause, and summary instead should specify that gambling is only lawful in Central City, Black Hawk and Cripple Creek. Second, they argue that a second source of ambiguity is the fact that the Initiative does not specify which Antonito city ordinances are to be applied to limited gaming establishments in Antonito. Thus, the petitioners argue, the title also should refer to specific sections of the Antonito city ordinances. We find no merit in these claims.
In In re Limited Gaming in Idaho Springs Amendment, 830 P.2d at 970, we determined that the title, submission clause, and summary of a limited gaming initiative were misleading because the text stated that the authority of the gaming commission was "statewide" in scope, rather than limited to four specific cities. The title and submission clause before us, however, do not suffer from this infirmity. Rather than suggesting that gambling is widespread, the phrase "areas where limited gaming is lawful" makes it clear that gambling is limited to certain specified areas.
The Initiative does not list the cities in which limited gaming currently is lawful, or the Antonito city ordinances which will be applied to limited gaming establishments in Antonito. However, the Board need not and cannot describe every feature of an initiative in the title and submission clause. In re Fair Treatment of Injured Workers Amendment, at 720; In re Proposed Tobacco Tax, 830 P.2d 984, 989 (Colo. 1992); In Re Limited Gaming in Manitou Springs Amendment, 826 P.2d at 1244. Rather, the title must correctly and fairly express the true meaning of the proposed initiative, and the submission clause should briefly and unambiguously state the principle of the provision sought to be added. § 1-40-106(3)(a) & (b); In re Fair Treatment of Injured Workers Amendment, at ___. In this case, the names of the cities in which *742 limited gaming is lawful and specific Antonito city ordinances are not essential for purposes of setting the title.

E
Finally, the petitioners argue that the title, submission clause, and summary are misleading because they suggest that legalizing gaming in Antonito is the true purpose of the Initiative. The petitioners claim that a fair reading of the entire Initiative shows that its true purpose is to expand the games which may be conducted, to change the method of appraisal of commercial property in areas where limited gaming is lawful, and to lower the tax rates on gambling proceeds. We agree that the title and submission clause are misleading.
In its brief, the Board argues that it did not have the authority to rearrange the title and submission clause of the Initiative in order of the relative significance of the subject matter because this would involve interpreting the meaning of the proposed measure. See In re Surface Mining Amendment, 797 P.2d at 1279. We addressed this same argument in In re Election Reform Amendment, 852 P.2d at 36, and held that the Board can arrange the title and submission clause so as to reflect the subject matters at issue, or a general overview of the proposal. Although we have stated that the subject matters of a title can be arranged in any order, even randomly, id., whatever arrangement the Board selects cannot be misleading. Here, the title and submission clause are misleading because of the order in which the material is presented.
The record supports the view that the purpose of the Initiative has two distinct parts: to authorize limited gaming in Antonito, and to effect far-reaching changes in all other areas in which limited gaming is lawful, regardless of the outcome of the election in Antonito. However, the provisions having statewide effect are buried between references to Antonito so that a voter quickly scanning the Initiative could be misled into believing that the measure only concerns limited gaming in Antonito. See Dye, 143 Colo. at 460, 354 P.2d at 500 (proposal couched in legalistic language rejected as likely to mislead voters in the haste of an election). In order to correctly and fairly express the true intent and meaning of the Initiative, all provisions solely concerning Antonito must be grouped together, and not separated and placed like bookends at both the beginning and the end of the title and submission clause. Grouping together related material is necessary to alert voters and petition signers that the Initiative not only involves limited gaming in Antonito, but also changes the provisions regulating limited gaming in all other areas in which limited gaming is lawful.[6]

IV
The petitioners' final argument is that the statement of fiscal impact contained in the summary is inadequate. We disagree.
If the Board finds that a proposed initiative will have a fiscal impact on the state or any of its political subdivisions, the summary must include an estimate and an explanation. § 1-40-106(3)(a), 1B C.R.S. (1993 Supp.). The purpose of a fiscal impact statement is to inform the electorate of the fiscal implications of the proposed measure. In re Proposed Initiative for an Amendment to Article XVI, Section 5, Colorado Constitution, Entitled "W.A.T.E.R.", 831 P.2d 1301, 1306 (Colo.1992); Citizens for Free Enterprise v. Department of Revenue, 649 P.2d 1054, 1060 (Colo.1982). However, a separate explanation of fiscal impact is not required *743 when the fiscal impact of a measure reasonably cannot be determined due to the variables involved. In re Election Reform Amendment, 852 P.2d at 37; In re Unsafe Workplace Environment Amendment, 830 P.2d at 1035; In re Proposed Initiative Under the Designation "Tax Reform", 797 P.2d 1283, 1291 (Colo.1990).
Pursuant to statute, the Board requested assistance from the Office of State Budget Planning and Budgeting (OSPB) and the Department of Local Affairs in preparing the fiscal impact statement. At the request of the OSPB, the Department of Revenue (DOR) also provided information. These agencies concluded that the fiscal impact of the measure, although significant, was indeterminate due to the number of variables involved.
During the two public hearings, the Board heard lengthy testimony from the petitioners as to the inadequacy of the fiscal impact statement. An entirely different fiscal impact was submitted at the rehearing due to DOR's mistaken reliance on adjusted gross proceeds, rather than adjusted net proceeds. Susan Conwell of the DOR testified extensively as to adjusted net proceeds, stating that the magnitude of the fiscal impact could not be specified since "literally the concept adjusted net proceeds is not defined.... There's no other state who taxes adjusted net proceeds. There's no definition. No one knows what that concept is."
After further questioning Ms. Conwell and a proponent of the Initiative regarding his intent, the Board adopted the fiscal impact statement contained in the summary which characterized the fiscal impact as significant, but indeterminate because of the necessity of defining "adjusted net proceeds." In its statement, the Board recognized that the tax base would be smaller, possibly producing a tax revenue loss. The Board estimated the cost of enforcement at $389,000 for the first year and $866,000 for the next year, but found that the costs to the local entity of additional services and infrastructural expenses could not be predicted. The Board also observed that the addition of new games might result in new revenues, but a change in the method of appraisal could cause some loss. Thus, the loss and revenue amounts could not accurately be predicted.
Given the complexity of the issues and the uncertainty expressed by the DOR, the Board's conclusion that the Initiative's fiscal impact is indeterminate is reasonable.

V
Finally, the respondent asks that we declare the signatures collected for the Initiative during the pendency of this appeal to be validly collected. We decline to do so. We have found in this opinion that the title and submission clause are misleading, and any signature collected by the circulation of a misleading submission clause cannot be valid. See § 1-40-110(2) (ballot title must be printed on each page of petition).
Second, the respondent requests an award of attorney fees and costs pursuant to section 13-17-102, 6A C.R.S. (1987). In the past, we frequently have noted that a registered elector who claims that the title, submission clause, and summary set by the Board do not clearly express the true meaning of the proposed initiative has a statutory right to file a motion for rehearing with the Board and, if that motion is denied, to obtain review in this court. See In re W.A.T.E.R. Initiative, 831 P.2d at 1307 n. 1.; In re Limited Gaming in Burlington Amendment, 830 P.2d at 1028; In re Proposed Tobacco Tax, 830 P.2d at 992. Thus, in seeking review by this court, the petitioners merely are exercising the statutory right granted in section 1-40-107(2), 1B C.R.S. (1993 Supp.). The petitioners are registered electors, their objections to the Board's actions succeeded in part, and the petitioners' appeal is not frivolous. We therefore reject the request to award attorney fees to the respondent for defending this appeal.
Accordingly, we affirm the ruling of the Board in part, reverse in part, and remand the matter to the Board with instructions.

APPENDIX
BE IT ENACTED BY THE PEOPLE OF THE STATE OF COLORADO: *744 Article XVIII is hereby amended by the addition of the following section:
Section 11. Limited gaming in Antonito
The people of Colorado hereby authorize the legalization of limited gaming in the city of Antonito, subject to the following terms and conditions:
1. Limited gaming must be approved in a local election as provided for in this article;
2. Limited gaming shall be administered by the state gaming commission created pursuant to this article;
3. Limited gaming shall include the playing of slot machines, the games of Poker, Blackjack, Craps, and Roulette, and any other games authorized by the state gaming commission;
4. The county assessor shall appraise the value of any commercial property within the city according to the actual use of such property;
5. To promote an economic climate for the industry which is comparable to other states, the tax rate for limited gaming shall not exceed 20% of the adjusted net proceeds;
6. After paying all administrative expenses, the General Assembly shall distribute the revenue from limited gaming as follows: 50% for senior-citizen health care, 20% for education, 15% to Antonito, 10% to Conejos County, and 5% equally among its adjacent counties;
7. The locations of all gaming premises, and the size of all gaming areas within those premises, shall be determined by the city ordinances in effect on November 25, 1993; and
8. Regardless of whether limited gaming has been approved in the local election, subsections three, four, and five of this section shall apply to all areas where limited gaming is lawful.
NOTES
[1] This opinion will refer to the ballot title and submission clause as the "submission clause."
[2] The respondent also raises several constitutional challenges to § 1-40-107(2). Because such considerations are far beyond the scope of our review of the title, submission clause, and summary of an initiative petition, we decline to address them. See In re Proposed Election Reform Amendment, 852 P.2d 28, 33 n. 2 (Colo. 1993).
[3] The text of the Initiative is appended to this opinion.
[4] The respondent urges us not to consider this argument since it was not raised by any of the petitioners' motions for rehearing before the Board. However, since (1) nothing in the statutory scheme requires registered electors to participate in the hearing at which the title, summary and submission clause are fixed, (2) registered electors are not required to appear and argue the merits of the petition for rehearing before the Board, and (3) the petitioners timely filed a motion for rehearing, we will address the merits of this argument. See In re Proposed Initiated Constitutional Amendment Concerning the "Fair Treatment of Injured Workers Amendment", 873 P.2d 718, 721 n. 3 (Colo.1994); In re Workers Comp Initiative, 850 P.2d 144, 147 (Colo.1993).
[5] Because we conclude that the proponents' failure to comply with the designation requirement contained in § 1-40-104 had no effect on the Board's jurisdiction, it is not necessary for us to address the respondent's argument that the statute unconstitutionally limits the right of a single person to propose an initiative.
[6] For this reason, on remand, the Board should amend the title and submission clause, in pertinent part, to read:

TO PERMIT LIMITED GAMING, SUBJECT TO A FUTURE LOCAL VOTE, IN THE CITY OF ANTONITO, AND TO ALLOCATE TAX AND FEE REVENUES FROM LIMITED GAMING IN ANTONITO; REGARDLESS OF THE OUTCOME OF THE LOCAL VOTE IN ANTONITO, TO EXPAND THE GAMES WHICH MAY BE CONDUCTED WHEREVER LIMITED GAMING IS LAWFUL, TO REDUCE THE MAXIMUM ALLOWABLE TAX RATE FOR LIMITED GAMING TO TWENTY PERCENT OF ADJUSTED NET PROCEEDS, AND TO REQUIRE THAT COMMERCIAL PROPERTY IN AREAS WHERE LIMITED GAMING IS LAWFUL BE APPRAISED BY THE COUNTY ASSESSOR ON THE BASIS OF ITS ACTUAL USE.